# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | No. 3:15-cr-00198 (JAM) |
| ARTHUR STANLEY,<br>*Defendant*. | |

## ORDER DENYING MOTIONS FOR JUDGMENT OF ACQUITTAL AND NEW TRIAL

A federal jury convicted defendant Arthur Stanley of murder under the federal Violent Crimes in Aid of Racketeering ("VCAR") statute. Stanley has filed motions for a judgment of acquittal or a new trial. For the reasons I explain below, I will deny these motions.

### BACKGROUND

On the night of July 15, 2011, a black Honda Accord pulled up outside a house on 67 Oakland Terrace in the North End of Hartford, Connecticut. Several gun shots were fired toward the house from the car, and the car then drove away. One of the shots struck Keith Washington in the head as he sat on the steps of the front porch. He died two days later in the hospital.

For the next several years the murder of Keith Washington went unsolved and uncharged. Ultimately, however, a federal investigation concluded that it was Arthur Stanley who shot and killed Keith Washington, and a grand jury returned an indictment in October 2015 charging Stanley with a violent crime (murder) in aid of racketeering, 18 U.S.C. § 1959(a)(1).[1]

The case proceeded to a jury trial before me in December 2016, and the jury returned a verdict of guilty. My determination of Stanley's post-trial motions requires a detailed review of

---

[1] Because of another federal drug trafficking investigation, Stanley has been detained since April 2014 and is awaiting sentencing to a term of at least 10 years of imprisonment following his plea of guilty in May 2015 to a conspiracy to distribute more than 280 grams of cocaine base from May 2013 to April 2014. *See United States v. Stanley*, 14cr81 (JAM).

trial evidence, viewing the evidence as I must in the light most favorable to the jury's guilty verdict.

### *Gangs and Rivalry in the North End of Hartford*

At trial the jury learned that in the summer of 2011 the North End of Hartford was rife with criminal gangs that controlled certain neighborhood territories where they sold drugs and where they violently excluded rival gangs. Doc. #135 at 46–56, 60, 100, 105–07; Doc. #136 at 182–86, 207–08. Two of the more prominent gangs were known as "Westhell" and "The Ave." The Westhell gang was associated with the area of Westland Street, while the Ave was associated with the area of Albany Avenue. Doc. #135 at 57–60.

For years Westhell and the Ave were in a feud with one another. Doc. #135 at 55–61, 107, 134; Doc. #136 at 180–83; Doc. #138 at 153–55. As one of the Ave's own members (Tyquan Lucien) described it at trial, there was "tension" and "beef" between Westhell and the Ave, with "lot[s] of shootings back and forth." Doc. #136 at 183.

A Hartford police sergeant (Anthony Pia) testified about his years of patrol in the areas controlled by Westhell and the Ave involving numerous gun and drug arrests involving both gangs. Doc. #138 at 25–27. Like other gangs in the North End of Hartford, Westhell marked its territory with graffiti. Doc. #135 at 56–57, 90, 134.

Law enforcement officers testified at trial about how they saw Stanley near Westland Street in the Westhell area, and they also saw him associate with others such as Melkuan Scott and Rashad Matthews whom the Government contended were members of Westhell. Doc. #135 at 167–68; Doc. #138 at 28–39. One of Stanley's longtime acquaintances (Brandyn Farmer) similarly testified to seeing Stanley in the area of Westland Street and in the company of

Melkuan Scott during the years before the shooting of Keith Washington in July 2011. Doc. #138 at 167–68.

Melkuan Scott lived on 27 Eastford Street in the heart of the Westhell zone. Doc. #135 at 135–36. In July 2008—approximately three years prior to the killing of Keith Washington—law enforcement received a tip about a cache of weapons in the woods behind Scott's house and near a garage bearing graffiti that read "Wes-Hell." When the agents went to investigate, they observed Matthews making his way through the woods and they watched as he deposited a gun in a duffel bag, which they subsequently seized along with another bag and found an assault weapon, seven handguns, and ammunition. Doc. #135 at 137–45, 161–66; Govt. Exs. 3F–3L.

### *The Shooting at 36 Vine Street*

The jury heard about two shooting incidents on the night of July 15, 2011. The first occurred shortly before 7:00 p.m., when Hartford police responded to a 911 "shots fired" call outside 36 Vine Street in the North End of Hartford. Doc. #135 at 181; Doc. #136 at 25, 219. The responding officers saw bullet holes in the windshield of a Mercedes car, bullet fragments inside the car, and a shell casing on the street, but they were unable to identify anyone on the scene who was responsible for the shooting. Doc. #136 at 27–34.

### *The Shooting and Killing of Keith Washington at 67 Oakland Terrace*

At around 9:30 p.m. on the same evening of July 15, 2011, Hartford police responded to a 911 call at 67 Oakland Terrace where they found Keith Washington lying face-down on the steps of the porch with a gunshot wound to his head. Doc. #135 at 220–22; Doc. #136 at 35–36. Forensic investigation concluded that at least three to four shots had been fired from the street area toward the front porch area of 67 Oakland Terrace. Doc. #136 at 174–75. Washington died two days later in the hospital. Doc. #137 at 205, 221.

The focus of the Government's evidence at trial was to show that it was Stanley who killed Washington as well as his gang-related reason for doing so. To prove its case, the Government introduced four categories of evidence. First, it called witnesses who claimed to have seen Stanley do the shooting. Second, it called witnesses who claimed that Stanley made incriminating statements to them. Third, it introduced evidence about the car—a black Honda Accord—that it alleged Stanley used. Lastly, the Government introduced evidence about Stanley's cellphone records to show that he was in communication within minutes of the shootings with a fellow Westhell member as well as to show his approximate location at the time of both shootings. These four categories of evidence are reviewed below.

### *Testimony of Eyewitnesses to the Shooting at 67 Oakland Terrace*

The Government called three witnesses—Tyquan Lucien, Willie Brown, and Al-Malik Sherrod—all of whom testified that they saw Stanley fire the shots at 67 Oakland Terrace. The first of these witnesses was Tyquan Lucien, a longtime member of the Ave gang with a history of vicious assaults and shootings. Lucien testified that, on the evening of July 15, 2011, he was playing basketball with other Ave members at Keney Park when he received a call from another Ave member, and then everyone left the park to go to Oakland Terrace. Doc. #136 at 219–28. Although Lucien was not permitted to testify what the caller had told him, his testimony about receiving the telephone call and leaving the park was consistent with the Government's contention that the shooting incident at Vine Street prompted concern on Lucien's part that he would be the subject of retaliation.

Lucien and the others made their way to an Ave member's house where Lucien met Keith Washington. *Id.* at 227. Lucien and Washington then went to 67 Oakland Terrace and a neighboring house. *Id.* at 227–29. The house at 67 Oakland Terrace was a gathering place for the

Ave. Doc. #135 at 59–60, 107–08; Doc. #137 at 153. Members of the Ave regularly met there to sell drugs, and weapons were stored in the yard. Doc. #136 at 215–18; Doc. #138 at 163–65; Doc. #139 at 26; Doc. #140 at 23.

Lucien testified that he went inside to get marijuana before returning to the porch of 67 Oakland Terrace where Washington was then sitting on the steps. Doc. #136 at 228–29. At that point, according to Lucien, "shots started ringing." Doc. #136 at 229. Lucien turned to look toward the street and saw that it was Stanley (a/k/a "Wigg") who had a gun in a black, two-door Honda Accord and was firing toward him. *Id.* at 232–33, 235; Doc. #137 at 20, 184. Lucien had seen that car before and had seen Stanley with the car. Doc. #137 at 22.

Lucien escaped back into the house while the car drove away. Doc. #136 at 230–33; Doc. #137 at 20–21. He left the area before the police arrived, and he would not implicate Stanley in the shooting until several years later when he began cooperating with the Government in 2015 upon being confronted with a new criminal charge that would have mandated he spend the rest of his life in prison. Doc. #137 at 27–28. Like several of the Government's trial witnesses, Lucien was subject to extensive cross-examination about his motives for testifying and his lengthy criminal history.[2]

A second eyewitness to the shooting was Willie Brown who testified that he was on the front porch of his home at 54 Oakland Terrace—two doors down and across the street from 67 Oakland Terrace. Doc. #140 at 26–27. Brown was a self-described "gang banger," who had gone to elementary school and previously served prison time with Stanley. *Id.* at 27, 38–39. Brown

---

[2] Lucien testified pursuant to a cooperation agreement that was his only hope of being spared an otherwise mandatory life term of imprisonment. Doc. #136 at 196–97, 213. He admitted to an appalling history of drug dealing, robberies, assaults, and shootings (sometimes for reasons of protecting his gang's drug territory), prior false statements to the FBI, unlawful possession of ammunition, as well as to taking part in a heinous plot to kill a prospective witness, the witness's girlfriend, and a child. Doc. #136 at 187–95, 202–03, 208–12. Lucien's history of crime, his many lies, and his anticipated benefits for testifying as a cooperator was the subject of extensive cross-examination by defense counsel. Doc. #137 at 29–129, 137–52.

testified that on the night of July 15, 2011, he saw a black, two-door Honda pull up to a stop in front of the house at 67 Oakland Terrace, and that he saw a gun come out of the passenger side window and fire about four shots. Doc. #140 at 29–31, 161. As the car then drove off and past Brown's house, Brown testified that he was able to see through the open window of the car that it was Stanley in the passenger seat inside the car. Doc. #140 at 30–33, 38–40, 161.

Brown's testimony that Stanley was one of two people in the car was inconsistent with Lucien's testimony that Stanley was alone in the car. Doc. #136 at 235. Like Lucien, Brown did not come forward to tell the police what he saw until much later, and he was subject to extensive cross-examination about his criminal history, as well as his extensive use of PCP and mental health problems.[3]

The third eyewitness to the shooting was Al-Malik Sherrod, who testified that on the night of July 15, 2011, he was sitting on the rail of the front porch of his home at 22 Oakland Terrace, and he saw well down the street where people were gathered on the porch at 67 Oakland Terrace. Doc. #140 at 209–11, 216. Sherrod testified that he saw a two-door black coupe drive down Oakland Terrace, that he saw the driver get out of the car, and that he saw the driver shoot four or five times across the hood of the car toward the house 67 Oakland Terrace. *Id.* at 214–18. The car left the scene and drove past Sherrod who saw that it was Stanley driving the car. *Id.* at 218–22; Doc. #141 at 25–26.

---

[3] Brown did not testify pursuant to a cooperation agreement, and he testified that he was testifying without promise of benefit from the Government for his testimony. Doc. #140 at 20–21. Notwithstanding that he witnessed the shooting, he testified that, because he was afraid for his family, he told the police that night when they came to his door that he had not seen anything. Doc. #140 at 37. He did not tell the police what he saw until more than two months later when he was in jail, when he then volunteered to speak to the police and identified Stanley. Doc. #140 at 48–53, 60–61. He was thoroughly questioned and testified about his criminal history, false statements, threats of suicide, and mental illness, stemming in part from his many years of using alcohol and PCP. Doc. #140 at 18–20, 24, 66–135, 151–52, 163–168.

Sherrod's testimony that he saw the shooter emerge from the car and shoot across its hood was inconsistent with the testimony of both Lucien and Brown that the shooter remained inside the car. Sherrod also differed from Brown in that he testified that Stanley was driving the car and that the car's window was closed. Doc. #141 at 98. Like Lucien and Brown, Sherrod did not come forward to tell the police what he saw until many months after the shooting, and he was subject to extensive cross-examination about his motives for testifying and his criminal history.[4]

### Stanley's Incriminating Statements

Two trial witnesses testified about incriminating statements that Stanley made to them. As noted above, Willie Brown testified that he saw Stanley shoot at 67 Oakland Terrace. Brown further testified that he saw Stanley again two days after the shooting on a street corner in Westhell territory. Doc. #140 at 41. According to Brown, Stanley was driving the same black Honda car as the night of the shooting. *Id.* at 42. Brown told Stanley he had "seen his work" on the night of the shooting, and Stanley "started smiling" and "then said he don't know if anybody got hit or whatever." *Id.* at 43. According to Brown, Stanley "told me that that happened because they shot at him like earlier in that day or something on Vine Street." *Ibid.* After Brown told Stanley that he had killed someone, Stanley "[j]ust started laughing. He started laughing." *Ibid.*

A second witness, Brandyn Farmer, testified that he was a former member of the Ave and had known Stanley since childhood from the area of Westland Street where Farmer's grandmother lived. Doc. #138 at 153, 158–60. According to Farmer, while he and Stanley were incarcerated at the Hartford jail together in February 2012, Stanley told him that he had driven a

---

[4] Sherrod was in prison at the time that he testified at trial without a cooperation agreement or promise of benefit if he gave a statement. Doc. #141 at 42–43. He first told the police his version of what he saw on the night of the shooting only after he was in prison in October 2012 for violation of parole and in hopes that the police "could help me with my case." Doc. #141 at 31–32. He testified to his lengthy criminal history including drug sales, robbery, assault, interfering, larceny, and smuggling contraband into prison, Doc. #140 at 206–10; Doc. #141 at 50–64.

Honda to Oakland Terrace and shot Keith Washington, but that he had shot Washington by mistake instead of Tyquan Lucien. Doc. #138 at 172, 174, 198. Stanley told Farmer that he was a "shooter" for the Westhell gang, and that he was trying to shoot Lucien because Lucien had previously shot at him on Vine Street that same day. *Id.* at 175; Doc. #139 at 27, 44.[5]

### *Stanley and the Black Honda Accord*

As noted above, numerous witnesses testified that Stanley was driving or riding in a black, two-door Honda Accord on the night when he shot and killed Washington. Other witnesses testified that they had seen Stanley driving a car of this description on other dates. Doc. #138 at 48; Doc. #139 at 153–54.

The car was bought in March 2011 by Chauncey Odum (a/k/a "Bird"). At trial, Odum's then-girlfriend (Amanda Odum) testified about Odum's friends from the Westland Street area who included Stanley, Melkuan Scott, and someone named "Rashad" whom the jury reasonably could have concluded was Rashad Matthews, another member of the Westhell gang. Doc. #139 at 204, 211–13. To similar effect, another one of Stanley's neighborhood acquaintances (Darnell Jones) testified that he saw Stanley driving around in the car with someone he knew as "Bird," and he had also seen the car parked on Eastford Street where Melkuan Scott lived. According to Jones, he spoke with Stanley about buying the car from him at some point after September 3, 2011, but decided not to buy it after learning that it may have been involved in a shooting. Doc. #139 at 156–58, 161–62, 168–69, 196.

---

[5] Farmer was a former member of the Ave who testified pursuant to a material witness arrest warrant and who did not testify pursuant to a cooperation agreement or with any pending cases or promise of benefit from the Government. Doc. #138 at 152; Doc. #139 at 55, 65–66. According to Farmer, he came forward with what he knew because "I thought it was right." Doc. #138 at 153. He testified that he had prior convictions including for firearm theft, burglary, and violation of a protective order. *Ibid.* Defense counsel on cross-examination not only highlighted this conviction history but also suggested that Farmer belatedly came forward to the Government while incarcerated in order to try to gain early release and that he eventually gained early release by trading on commonly known "street information" or rumors that Stanley had done the shooting. Doc. #138 at 209–28; Doc. #139 at 33–41.

In October 2011, about three months after the shooting of Keith Washington, the police located the car on a side street near Westland Street. Doc. #138 at 48–49. It had a bullet hole in it, and two of the items inside—a blue latex glove and an orange juice bottle—tested positive for Stanley's DNA. Doc. #138 at 60–62; Doc. #139 at 99–103.

### Cellphone Evidence

The Government introduced Stanley's cellphone records to show that he was making or receiving telephone calls with at least one other Westhell gang member (Rashad Matthews) on the night of July 15, 2011, and also to show his approximate location at the time of both the Vine Street shooting and the later shooting of Keith Washington at Oakland Terrance. As to the Vine Street shooting, the cellphone evidence showed that one minute after a 911 call was placed to the police at 6:47 p.m. about that shooting, Stanley's cell phone placed and received several calls with the cell phone of Rashad Matthews. Doc. #141 at 225–26; Doc. #142 at 17–18; Govt. Ex. #45 at 12. This was consistent with the Government's contention—based on the testimony of Brandyn Farmer and Willie Brown—that Stanley's shooting of Keith Washington was a gang-related attempt to retaliate against the Ave and against Tyquan Lucien in particular.

On the basis of cellphone records reflecting which cellphone towers were connecting to Stanley's telephone, an FBI agent used a map exhibit to testify about the approximate zonal location of Stanley's telephone while he was making or receiving telephone calls during the night of July 15, 2011. Doc. #141 at 208–26; Doc. #142 at 9–105; Govt. Ex. 45; *see also Carpenter v. United States*, 138 S. Ct. 2206, 2212–13 (2018) (discussing collection and use of cell-site location information to approximate location of a cellphone at specific times).

The cell-site location evidence suggested that Stanley was in the North End of Hartford and possibly in the vicinity of the Vine Street shooting and during subsequent telephone calls

with Rashad Matthews. Doc. #142 at 16–17, 83–84; Govt. Ex. #45 at 12. More importantly still, the evidence showed that at 9:27 p.m.—just one minute before the 911 call that was made to the police at 9:28 p.m. to report the shooting of Washington at 67 Oakland Terrace—Stanley's cell phone connected to the single cell tower (Tower #39) that was nearest to 67 Oakland Terrace in order to receive an incoming call. Doc. #142 at 20–24, 97–98, 102; Govt. Ex. 45 at 15; Govt. Ex. 45A. Minutes later Stanley's phone connected several times more with other telephones including the telephone of Rashad Matthews, and these later calls connected through North End cell towers that were more distant from 67 Oakland Terrace. Doc. #142 at 25–26; Govt. Ex. 45 at 16–17. At no other time on the night of July 15, 2011, did Stanley's cellphone connect to the tower nearest 67 Oakland Terrace. This evidence supported the Government's contention that Stanley was at 67 Oakland Terrace during the shooting and then fled to the area of Westland Street immediately afterwards.

The Government rested its case after more than seven days of evidence presented in its case-in-chief from December 5 to December 14, 2016. Stanley called four witnesses in his defense on December 14 and 15, 2016, and the Government did not present a rebuttal case.[6] The jury heard closing arguments and final instructions on December 15, 2016, and then returned a verdict of "Guilty" on its third day of deliberations on December 19, 2016.

---

[6] The defense witnesses included: a law enforcement officer who testified about a prior inconsistent statement made by Al-Malik Sherrod concerning where he saw Stanley's car (Doc. #142 at 120–21); a toxicologist to testify as relevant to the testimony of Willie Brown about the effect of PCP on a witness's memory (*id.* at 145–46); a forensic consultant to testify with photographs and video about visibility of 67 Oakland Terrace and the street from the vantage point at 22 Oakland Terrace where Sherrod testified he was on the night of July 15, 2011 (*id.* at 155–99); and a crime scene reconstruction expert to testify about bullet evidence at 67 Oakland Terrace (*id.* at 225–33; Doc. #143 at 14–45).

Stanley has filed a motion for judgment of acquittal pursuant to Fed. R. Crim. P. 29 to challenge the sufficiency of evidence, as well as a motion for new trial pursuant to Fed. R. Crim. P. 33 alleging errors at trial. I will review each in turn.

### *Rule 29 Motion for Judgment of Acquittal*

For purposes of a motion for a judgment of acquittal, I must review the evidence in the light most favorable to the Government, defer to the jury's assessments of witnesses' credibility and the weight of the evidence, and sustain the jury's verdict if any rational trier of fact could have found the evidence sufficient to establish the essential elements of the crime beyond a reasonable doubt. *See United States v. Baker*, 899 F.3d 123, 129 (2d Cir. 2018). In order for a jury to arrive at a verdict, "[t]he law permits inferential fact finding . . . even when the burden of proof is beyond a reasonable doubt," *M.O.C.H.A. Soc'y, Inc. v. City of Buffalo*, 689 F.3d 263, 276 (2d Cir. 2012) (internal citations omitted), so long as the jury does so rationally, and does not "conclude upon pure speculation or from passion, prejudice or sympathy." *United States v. Vernace*, 811 F.3d 609, 615 (2d Cir. 2016).

The charge of violent-crime-in-aid-of-racketeering (VCAR) under 18 U.S.C. § 1959(a)(1) required the Government to prove the following five elements:

1. That there existed an enterprise affecting interstate or foreign commerce, as defined under 18 U.S.C. § 1959(b)(2);

2. That the enterprise was engaged in racketeering activity as defined in 18 U.S.C. § 1961(1), which as charged in this case included the illegal distribution of controlled substances in violation of 21 U.S.C. §§ 841(a) and 846;

3. That Stanley held a position in the enterprise;

4. That Stanley committed a crime of violence (murder) that violated state or federal law; and

5.  That Stanley committed the crime of violence to maintain his position in the enterprise. Doc. #127 at 9–14 (jury instructions); *United States v. Burden*, 600 F.3d 204, 220 (2d Cir. 2010) (outlining VCAR elements). Although Stanley does not dispute that the evidence was sufficient for the jury to find that he murdered Washington, he argues that the evidence was not legally sufficient for any of the remaining four VCAR elements. I will discuss each element in turn.

### *Existence of an Enterprise*

Stanley argues that the Government failed to establish that a gang named "Westhell" existed as a racketeering organization involving illegal drug dealing. Doc. #153 at 4–7. He points out that no member of Westhell testified to the organization's existence, and he notes that the Government did not show that the Westhell group had particular rules, leadership roles, or common colors, financial arrangements, or training sessions. *Id.* at 5–6.

The VCAR statute encompasses "any . . . group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1959(b)(2). This is an expansive definition, and if the Government proves up the existence of a group of people who associate together for the common purpose of engaging in a course of conduct that affects interstate commerce, it need not prove up more particular aspects of the functioning of that group. *See Boyle v. United States*, 556 U.S. 938, 946–48 (2009) (construing analogous requirements for "enterprise" as defined for RICO purposes under 18 U.S.C. § 1961(4)). It is sufficient if the enterprise is shown to have "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *United States v. Applins*, 637 F.3d 59, 73 (2d Cir. 2011) (quoting *Boyle*, 556 U.S. at 946). Moreover, an enterprise "need not have a hierarchical structure, a chain of command, or other business-like

attributes," and evidence of the existence of the enterprise may be proved in part by evidence of racketeering acts such as drug dealing. *Ibid.*; *see also Burden*, 600 F.3d at 215 ("the existence of an association-in-fact is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure") (internal quotations and citation omitted).

The Government met its burden here. As described above, jurors heard ample testimony from several witnesses about the existence of a group of individuals known as "Westhell" that operated on and near Westland Street and as corroborated by physical evidence of "Wes Hell" graffiti on a garage near Melkuan Scott's house, as well as Stanley's own incriminating statement to Brandyn Farmer that he was a "shooter" for Westhell. Doc. #135 at 55–61; 103–04, 135–40; Doc. #136 at 183–86; Doc. #138 at 30–38; Doc. #139 at 44; Govt. Ex. 3F. The jury similarly heard evidence that members of Westhell engaged in drug dealing while excluding rival gangs from its territory. Doc. #135 at 50–51, 104–05; Doc. #136 at 182–86; *see also* Doc. #135 at 119–27 (testimony about effect of drug dealing on interstate commerce). All this evidence was enough for the jury to conclude beyond a reasonable doubt that there existed an enterprise known as "Westhell" as required for conviction under the VCAR statute.

### *Engagement in Racketeering*

Stanley next argues that the evidence was not sufficient to support the jury's conclusion that Westhell was engaged in racketeering activity. I do not agree. The Government introduced the expert testimony of Hartford Police Sergeant O'Hare about the existence of drug dealing gangs in Hartford and in particular about the existence of Westhell. Doc. #135 at 41, 51, 56–57, 104, 106–07. Another witness—Sergeant Pia—testified specifically about his years of police work in the North End including in the Westland Street area where crack cocaine was predominantly sold. Doc. #138 at 26. When asked "what your personal observations were

concerning the sale of drugs in that area in the City of Hartford," he testified that in the North End there were "three pretty busy areas for drug dealing," including one area that was "the Westland Street area, the Westhell group." *Id.* at 25. He further testified that he had "been involved with gun arrests and drug arrests of pretty much almost every high-ranking member of all three gangs," including the Westhell gang. *Ibid.* On top of all this, the jury could well have inferred that Westhell was engaged in drug trafficking as the very reason for its violent, territory-based conflicts with neighboring gangs and as the very reason for Stanley's admitted role as a "shooter" for Westhell.

Stanley faults the Government for not introducing particular types of evidence, such as testimony from a Westhell gang member or evidence about particular drug transactions or seizures. Doc. #153 at 11. But the law does not specify that a jury may consider only particular types of evidence when concluding whether the Government has proven that an enterprise was engaged in racketeering activity.

Stanley argues that Sergeant O'Hare testified that gang members may engage in drug sales "for financial gain personally, not necessarily always for the group." Doc. #135 at 51. But the fact that individual gang members may have personally benefited from their labors rather than channeling all their proceeds to a common group fund does not preclude a conclusion that each individual member was nonetheless a part of an enterprise that extended in part to the violent exclusion of competing drug dealers from other groups within the enterprise territory. *See United States v. Pimentel*, 346 F.3d 285, 301 (2d Cir. 2003) (evidence of enterprise's drug trafficking activity sufficient despite lack of evidence that individual members paid portion of proceeds into an organization's "kitty"); *United States v. Feliciano*, 223 F.3d 102, 116–17 (2d Cir. 2000) (noting that "[w]here individuals are associated only 'in fact,' determining whether

the subject enterprise engaged in racketeering activity requires fact-based attention to the ways in which, for example, the individuals acted for the group and/or in concert with other members, or acted in ways that contributed to the purposes of the group, or that were facilitated or made possible by the group").

Stanley argues that the Government failed to prove that he personally engaged in drug trafficking transactions. But the elements of the VCAR offense did not require the Government to do so. The fact that the indictment alleged that Stanley himself engaged in drug trafficking activity is of no consequence, because the Government was not required at trial to prove up surplus allegations of an indictment that exceeded the requirements for proof of a charged crime. *See, e.g.*, *United States v. Coté*, 544 F.3d 88, 102 (2d Cir. 2008) (Sotomayor, J.).

Stanley argues that a conviction may not be based on mere presence during the commission of a crime or mere knowledge of without intentional participation in a conspiracy. *See, e.g.*, *United States v. Samaria*, 239 F.3d 228, 235 (2d Cir. 2001) (Sotomayor, J.), *abrogated in part by United States v. Huezo*, 546 F.3d 174, 181–82 (2d Cir. 2008); *United States v. Jones*, 30 F.3d 276, 283 (2d Cir. 1994). I agree in principle but conclude that the evidence here was enough for the jury to conclude that members of Westhell worked together to promote and protect their drug trafficking activities, as distinct from happening to engage in individual drug dealing within the Westland Street area without any collaborative connection amongst themselves.

### Stanley's Position in the Enterprise

Stanley argues that the evidence was not sufficient to show that he was a member of the Westhell gang. I do not agree. Brandyn Farmer testified that Stanley told him he was a "shooter" for Westhell. Doc. #139 at 44. As the jury otherwise learned from Tyquan Lucien on cross-

examination, a shooter's job was the work of killing. Doc. #137 at 39–40. Additional evidence corroborated Stanley's declaration of Westhell membership—such as his sightings in Westhell territory with Westhell members like Melkuan Scott and Rashad Matthews, Doc. #135 at 166–68; Doc. #138 at 34–35, 38–39, as well as the fact that he shared the use of a car with Westhell's members, Doc. #139 at 153–60, 206–16, a practice the jury learned was common among gangs, Doc. #135 at 51. Because all this evidence corroborated Stanley's admission that he was a Westhell member, there is no merit to Stanley's reliance on precedent that disallows a conviction to be based solely on a defendant's own inculpatory statements. *See, e.g.*, *United States v. Bryce*, 208 F.3d 346, 355–56 (2d Cir. 1999) (Jacobs & Sotomayor, J.J.).

### Stanley's Purpose in Committing the Murder

Stanley argues that the evidence was not sufficient to prove that one of his motives for the shooting at 67 Oakland Terrace was to maintain or increase his role in the Westhell racketeering enterprise. But, as noted above, Stanley told Farmer that he was a shooter for Westhell, and he separately told Brown two days after the shooting that he did it to target Lucien (a member of the Ave) because of Lucien's role in the shooting at Vine Street. In the context of other evidence about the long-running violent conflict between Westhell and the Ave, as well as Stanley's contemporaneous telephone communications with fellow Westhell member Rashad Matthews within minutes of both the Vine Street and Oakland Terrace shootings, the jury reasonably could have concluded that one of Stanley's reasons for doing the shooting at 67 Oakland Terrace was to carry out his role as a Westhell shooter and to thereby maintain or increase his position in the organization. *See Burden*, 600 F.3d at 220, 221 (noting that VCAR statute does not require the purpose to be the "sole or principal motive" and that "[p]ersonal beefs also may have been satisfied, but the evidence supported a finding that the defendants

engaged in violent acts because it was expected of them as a way of taking care of each other and as members of the Organization"); *see also United States v. Aquart*, 2018 WL 6683913, at *10 (2d Cir. 2018) ("motive element can be satisfied by evidence that allows a jury to infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership" or "in order to protect the enterprise's operations and further its objectives") (internal quotations and brackets omitted); *United States v. Concepcion*, 983 F.2d 369, 381–82 (2d Cir. 1992) (VCAR purpose element proved based on transferred intent theory and notwithstanding fact that defendant shot person who was not member of rival gang; "[w]e reject the suggestion that the government must prove that the victim of the violence was the defendant's intended target").

In short, the evidence was sufficient for the jury to conclude that Stanley was guilty of murder-in-aid-of-racketeering in violation of 18 U.S.C. § 1959. Accordingly, I will deny Stanley's motion for a judgment of acquittal.

### Rule 33 Motion for a New Trial

Stanley moves for a new trial pursuant to Federal Rule of Criminal Procedure 33. Doc. #155. The ultimate test for a Rule 33 motion is "whether letting a guilty verdict stand would be a manifest injustice." *United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018). Although a court may exercise discretion to weigh evidence and evaluate the credibility of witnesses, *United States v. Truman*, 688 F.3d 129, 141 (2d Cir. 2012), it may only do so in exceptional circumstances, such as "where testimony is patently incredible or defies physical realities." *United States v. McCourty*, 562 F.3d 458, 475–76 (2d Cir. 2009) (internal quotation marks and citation omitted). I will address each of Stanley's arguments for a new trial in turn.

### *Credibility of Testimony of Lucien, Sherrod, and Brown*

Stanley argues that the testimony of three of the Government's primary witnesses—Lucien, Sherrod, and Brown—was inherently not credible. He points to significant discrepancies in each of these witness's account concerning what they saw on the night of the shooting (*e.g.*, with respect to where the car was, whether it was moving, whether Stanley was driving alone or in the passenger seat with someone else driving, and whether Stanley got out of the car to shoot). For two of the witnesses (Sherrod and Brown), he challenges their ability to have seen what they claimed to see from their vantage points further down Oakland Terrace and in nighttime lighting conditions. He also points to how each of these three witnesses have significant criminal history (as well as mental health history for Brown) and how they did not come forward with information on the night of the shooting but only came forward months or years later in hopes of some benefit for their testimony. *See* Doc. #155 at 5–20. According to Stanley, each of these three witnesses heard street rumors about Stanley's involvement, and they treacherously tailored their testimony to what they thought the Government wanted to hear. *Id.* at 19.

I agree with Stanley that there were many reasons to doubt the credibility of Lucien, Sherrod, and Brown, but I do not agree that their testimony altogether defied physical reality or otherwise crossed the line from questionable to inherently unbelievable. Nor do I agree with Stanley that the Government knew or should have known the testimony to be false.[7]

---

[7] Stanley notes that there was a time at trial when I queried whether the Government stood by the testimony of Sherrod in view of the distance he was down the street from 67 Oakland Terrace. Doc. #155 at 14. The Government responded that it stood by the testimony and that it would introduce more testimony from a detective concerning what could be seen from the vantage point where Sherrod claimed to be. *Ibid.* Although I think it was readily debatable whether Sherrod could see what he claimed to see, I was satisfied with the Government's response and that Stanley was fully able to impeach Sherrod's testimony (in part by introducing testimony through an expert defense witness). Stanley also notes that I questioned the Government about its eliciting testimony from Sherrod about what he had previously told a detective in a manner that might be misleading. *Id.* at 15. As I noted at the time, however, I did not believe that the Government pursued this line of questioning in bad faith. Stanley did not request any curative measures, and any possible error involving this isolated line of questioning was harmless.

Stanley had the benefit of three attorneys through trial who worked very diligently to assail all of the many contradictions and weaknesses in these witnesses' accounts as well as to underscore the incentives they had to testify falsely. In my view, it was properly a jury question whether these witnesses—baggage and all—were telling the truth. "The established safeguards of the Anglo-American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury." *Hoffa v. United States*, 385 U.S. 293, 311 (1966); *see also United States v. Truman*, 688 F.3d 129, 139–41 (2d Cir. 2012) (rejecting trial court's conclusion that cooperating witness testimony was incredible as a matter of law in both Rule 29 and Rule 33 contexts).

Moreover, differing testimony as to details (such as exactly where the car was, whether it was moving, whether the shooter remained in the car, or how many people were in the car or on the porch at 67 Oakland Terrace) could reasonably have been understood by the jury to be attributable to differences among the witnesses' memory of events. "Differences in recollection do not constitute perjury." *United States v. Josephberg*, 562 F.3d 478, 494 (2d Cir. 2009).

The jury was aware of its role and cautioned about assessing the credibility of witnesses, including the importance of approaching with great care the testimony of cooperating witnesses and witnesses who may have motives to obtain their freedom by cooperating. *See* Doc. #143 at 106–10. Although it would not have surprised me if the jury had reached a "Not Guilty" verdict in light of the many challenges raised by defense counsel to the credibility of the Government's witnesses, I am not convinced that the jury's "Guilty" verdict amounted to no less than "a seriously erroneous result or that the verdict is a miscarriage of justice." *Smith v. Carpenter*, 316 F.3d 178, 183 (2d Cir. 2003) (internal quotations omitted). Accordingly, I decline to exercise my

discretion to set aside the jury's verdict on the ground of any doubts about the credibility of the Government's witnesses.[8]

### Alleged Improper Statements at Closing Argument

Stanley next claims that the Government improperly vouched for its witnesses during its rebuttal closing argument. Doc. #155 at 21–23 (citing Doc. #143 at 177–78). After Stanley's counsel claimed in closing argument that the Government's witnesses would be motivated to lie at trial in order avoid contradicting their previous statements to police, Doc. #143 at 153–54, the Government responded in rebuttal argument and over objection from defense counsel that the witnesses instead could have chosen not to testify or admitted at trial that their previous statements were false, Doc. #155 at 21–23. According to Stanley, the Government's rebuttal falsely implied that the Government's witnesses could refuse to testify or change their statements without consequence, ignoring the Government's ability to compel testimony through subpoenas or prosecute witnesses for perjury or making false statements. *Id.* at 22.

The Government has substantial latitude to respond to the defense's arguments in rebuttal argument. *See Aquart*, 2018 WL 6683913, at *16. I conclude for substantially the reasons set forth in the Government's briefing that the Government's argument was a fair response to Stanley's argument. After Stanley argued that the witnesses had been "locked" into telling the versions of facts they had previously told to law enforcement, it was perfectly appropriate for the Government to point out that the witnesses could have declined to testify or have testified

---

[8] Stanley cites *United States v. D'Angelo*, 2004 WL 315237 (E.D.N.Y. 2004), for the proposition that "a long list of crucial, irreconcilable conflicts" in testimony indicates uncoordinated perjury, rather than a misremembering of events. Doc. #155 at 19 (citing *D'Angelo*, 2004 WL 315237 at *19). But *D'Angelo* was an extreme and unusual case where the discrepancies were so stark that the prosecution itself "conce[ded] that the accomplice testimony was rife with perjury on critical factual issues going to the heart of the case." *Id.* at *15. Here, the Government stood by its witnesses at trial and continues to stand by its witnesses now. Doc. #173 at 38; Doc. #141 at 234–36. Because there has not been an adequate showing that the Government's evidence included perjured testimony, there is no need for me to consider the lower standard cited by Stanley for granting a new trial when there has been perjury. *See United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991).

differently at trial and that they were under no legal compulsion to parrot the versions of the facts that they had previously provided. The Government neither implied the existence of facts not in evidence nor omitted material information to the jury's evaluation of the witnesses' credibility. The jury already knew of the Government's power to issue subpoenas and to prosecute for false statements. Doc. #138 at 151–52; Doc. #139 at 29–40. The jury had the information that was material to evaluating the witnesses' motives, and I therefore conclude that the Government's rebuttal argument was not erroneous and does not warrant the grant of a new trial.

### *Omission of Complete Elements of Drug Offense from Jury Instructions*

Stanley further argues that he should be granted a new trial because the jury instructions did not specifically define the elements of the federal drug trafficking crime that was alleged to be the predicate racketeering crime. Doc. #155 at 23–28. Stanley, however, did not request the jury instruction that he now argues that the Court should have given. *See* Fed. R. Crim. P. 30(d). The jury instructions correctly advised the jury that, in order to prove the second element of the charged VCAR crime, the Government must prove that the Westhell enterprise was engaged in "the illegal distribution of controlled substances," such as cocaine, crack cocaine, and marijuana, and the instructions further explained that "[f]ederal law makes it a crime for someone to knowingly and intentionally sell or distribute these controlled substances or to knowingly possess these controlled substances with an intent to distribute them." Doc. #143 at 93–94.

It is true that the preferred practice in VCAR cases is to outline the underlying elements of the predicate racketeering crime, but the Second Circuit has made clear that an element-by-element recitation is not necessarily required in the absence of a risk that the jury will be confused about what facts must be proved in order to establish the predicate crime. *See United States v. Pimentel*, 346 F.3d 285, 302–05 (2d Cir. 2003). Although the Court's instructions did

not frame the description of the predicate crime (federal drug trafficking) in an element-by-element format, the instructions described at some length the requirements for conviction of a federal drug trafficking crime, and Stanley does not point to any aspect of federal drug trafficking that the instructions omitted.

Stanley argues that the jury "hear[d] a plethora of generic evidence regarding drug dealing in the North End of Hartford and on Westland Street" and may not have understood that they must consider whether Westhell members were engaged in drug dealing as part of the enterprise. Doc. #155 at 27. In fact, the jury was specifically instructed that "[t]he alleged racketeering activity must relate to the operation of the charged enterprise," and that crimes by enterprise members "whose activities are unrelated to the goals or activities of the enterprise do not qualify as racketeering activity." Doc. #143 at 94.

The jury was properly instructed that, in order to return a verdict of guilty against Stanley, it must find that the Westhell enterprise was engaged in federal drug trafficking activity. Accordingly, because Stanley did not object to the Court's jury instruction and because he has not shown any prejudice stemming from the lack of an element-by-element recitation of the requirements for a federal drug trafficking crime, I conclude that any error in the Court's jury instruction does not warrant the grant of a new trial.

## CONCLUSION

For the reasons set forth above, Stanley's motions for a judgment of acquittal (Doc. #152) and for a new trial (Doc. #154) are DENIED.

It is so ordered.

Dated at New Haven this 3d day of January 2019.

/s/*Jeffrey Alker Meyer*_____
Jeffrey Alker Meyer
United States District Judge